UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2020 SEP 29 PM 3:41
CLERK
BY KP
DEPUTY CLERK

| | |
|---|---|
| LISA L. SANCHEZ, as Administratrix of the ESTATE OF JOYCE ELAINE MUNSON,<br>Plaintiff<br><br>v.<br><br>HELEN PORTER NURSING HOME, INC. D/B/A THE UNIVERSITY OF VERMONT HEALTH NETWORK- HELEN PORTER REHABILITATION AND NURSING,<br><br>Defendant | Case No.: 2:20cv153 |

## COMPLAINT AND JURY DEMAND

Plaintiff Lisa Sanchez, as Administratrix of the Estate of Joyce Elaine Munson [hereinafter PLAINTIFF] complains and states the following:

### INTRODUCTION

This is an action in which it is contended that Joyce Elaine Munson, who died in Chittenden County on October 1, 2018 had been illegally denied admittance to Defendant Helen Porter Nursing Home, Inc. on the basis of her psychiatric disabilities. Plaintiff contends that the conduct of Defendant Helen Porter Nursing Home, Inc. [hereinafter Defendant] in denying Joyce Elaine Munson admission to the nursing home was done in violation of Federal and State Fair Housing Laws, the Americans with Disabilities Act, and The Rehabilitation Act of 1973.

1

COMPLAINT FOR DAMAGES AND JURY TRIAL

## NATURE OF THIS ACTION

1. This is an action for relief from Defendant's violations of Joyce Elaine Munson's civil rights. These violations include, among other things, discrimination on the basis of Ms. Munson's disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et. seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C §501 *et. seq.,* (the "Act") the Fair Housing Act, 42 U.S.C. §§ 3601-3619 *as amended by* the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(a)-(b)(2), (e), 102 Stat. 1619, 1622 (1988) (codified as amended in scattered sections of 42 U.S.C.), and the State of Vermont's Fair Housing and Public Accommodations Act, 9 V.S.A. § 4500 *et. seq,*

2. Plaintiff Lisa Sanchez, in her capacity as the Administratrix of the Estate of Joyce Elaine Munson, seeks declaratory and injunctive relief, compensatory damages, plus reasonable attorney's fees and costs, for Defendant's violations of Joyce Elaine Munson's civil rights under Federal and State law.

## VENUE AND JURISDICTION

3. The Court has jurisdiction over this action under 28 U.S.C. §1331 because certain of the claims arise under federal statutes, including the ADA, the Rehabilitation Act, and the Federal Fair Housing Act, all of which vests jurisdiction in the District Court. The District Court has supplemental jurisdiction over Plaintiff's state law claims because those claims are so related to her federal causes of action that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. §1367(a).

4. Venue is proper in the District of Vermont because Plaintiff's claim for relief arose in Middlebury and Rutland, Vermont, where all relevant acts and omissions supporting Plaintiff's claims for relief occurred.

## PARTIES

5.   Lisa Sanchez is a resident of New Haven, Vermont. She is the biological daughter of Joyce Elaine Munson, who died in Williston, Vermont on October 1, 2018. Lisa Sanchez is the duly appointed Administratrix of the Estate of Joyce Elaine Munson, which matter is pending in the Superior Court of Vermont, Addison Unit, Probate Division, Docket No. 482-11-18 Anpr.

6.   Plaintiff is informed and believes and based thereon alleges that Helen Porter Nursing Home, Inc. is a corporation existing and duly authorized to do business in the State of Vermont, doing business as The University Of Vermont Health Network - Helen Porter Rehabilitation and Nursing, with a principal place of business at 30 Porter Drive, Middlebury, Vermont, 05753.

7.   All the acts and failures to act were performed by or attributable to the Defendant. Said acts, or failures to act, were within the scope of the inherent authority, employment, and/or direction and control of the Defendant by and through its agents, officers and employees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.   There is no exhaustion of administrative remedies requirement in this action.

## JURY TRIAL DEMAND

9.   Plaintiff demands a jury trial on all issues so triable.

## FACTUAL BACKGROUND

10.   Joyce Munson was an individual with psychiatric disabilities. Joyce was a resident of Addison County for over seventy-seven (77) years, and her close family are all residents of

3

COMPLAINT FOR DAMAGES AND JURY TRIAL

Addison County. Joyce received services for her psychiatric disabilities from the Counseling Services of Addison County (CSAC) beginning in 1993.

11. In August 2016, Joyce suffered a compression fracture in her L3 spine. She was treated for this injury at the Helen Porter Medical Center emergency department. Upon her release from the emergency department she returned home. Services through Addison County Home Health were put in place.

12. Within forty-eight (48) hours of her return home, Joyce suffered a medical emergency requiring transport by ambulance; however, Helen Porter Rehabilitation and Nursing ("Helen Porter") refused to accept her for care stating that she "was not a candidate for their facility." She was subsequently transported to Kindred Transitional Care and Rehabilitation - Birchwood Terrace ("Birchwood") in Burlington, Vermont, which was located over an hour away from her home, her psychiatric care team, her family, her supports, and everything she was familiar with.

13. While at Birchwood it was determined that Joyce required wrap-around care, not short-term rehabilitation. Ms. Sanchez made a request to Birchwood staff for Joyce to be transferred to Helen Porter for long-term care. The Birchwood staff made several unsuccessful attempts to accomplish this transfer. Birchwood staff disclosed to Ms. Sanchez and her family that the Helen Porter admissions director told them (Birchwood staff) that Joyce "did not meet their patient profile." In addition, Ms. Sanchez, as well as Birchwood staff, was informed that Joyce would not even be considered for admission into Helen Porter until an outstanding balance of $400 from a previous stay was paid.

14. In October 2016, Joyce was placed at the Living Well Care Home ("Living Well"), a Level 3 care home in her community, nearer to her family, care team, and supports. This living

situation lasted until February 9, 2017 after a fourth fall required that Joyce be transported to the Helen Porter emergency room. The attending physician in the emergency room asked Joyce if she felt safe at Living Well. Joyce told him that she did not feel safe there.

15. Then, the Helen Porter attending physician asked Joyce where she would like to go next. Ms. Sanchez explained that it was always Joyce's wish to be placed in Helen Porter for long-term care, but she was repeatedly denied because she was not "fit" for their facility. Joyce was admitted to the hospital and the admitting staff began advocating on her behalf in seeking admission to the long-term care facility.

16. On February 20, 2017, Ms. Sanchez received a telephone call from Anza Armstrong at Helen Porter, who reported, again, that Joyce "was not a good fit for their facility" based on past behavior while at their rehabilitation unit. Ms. Armstrong further stated that Joyce would not be placed on their wait list. Ms. Sanchez was told that Dr. Karen Fromhold had made this decision.

17. That same day Ms. Sanchez filed a complaint on Joyce's behalf with the Helen Porter long-term care facility.

18. In response to the filed complaint, Ms. Sanchez received a call on February 22, 2017 from the Helen Porter admissions director, Doreen Kadric, who stated that there must have been some type of 'misunderstanding' and that Lisa's mother was not a candidate for their long-term care unit because of past behavior, as Dr. Fromhold had said, but rather she was not a candidate simply because "there were no available beds."

19. Ms. Sanchez was then asked by Doreen if her family had considered private care options for Joyce, to which Ms. Sanchez indicated the family could not pay for private care. Ms.

5

COMPLAINT FOR DAMAGES AND JURY TRIAL

Sanchez was guided by Doreen to reach out to the local Agency on Aging for guidance and assistance and wished "good luck" by Doreen.

20. When Ms. Sanchez pressed for her mom to be added to the wait list Doreen indicated that she would now add Joyce to the Helen Porter wait list. Doreen also indicated that adding Joyce the week before (when requested by the Helen Porter Hospital social worker), would not have mattered because the wait list was 34 people long and "admittance" did not "look very good" for the Joyce.

21. Ms. Sanchez then asked Ms. Kadric why Joyce was not being placed on the Helen Porter long-term care wait list when it was requested by Helen Porter social work staff the week prior. Ms. Kadric then told Ms. Sanchez that Joyce's name would be added to the list but that "it didn't look good."

22. On the evening of March 1st, at 5:00 p.m., Ms. Sanchez received a call from Alison Wurst, APRN, Director of Case Management at Helen Porter Hospital, that went to her voicemail as she was in a meeting at work. The message indicated that Joyce was being transferred first thing on Thursday, March 3, 2017 to a facility in Rutland, Vermont. When Ms. Sanchez tried to call back at 5:15 p.m., Ms. Wurst had already left the office.

23. On March 2, 2017 Alison Wurst wrote a letter on behalf of Joyce in support of her receiving care close to natural supports such as family, and that staying in Addison County would allow this. At that point in time Joyce was a patient at Helen Porter Hospital on a 'swing bed' status. Joyce's children, as well as her counselor from Addison County Counseling Service, and various in-laws from the Middlebury area, were visiting her regularly.

24. Ms. Sanchez again called Ms. Wurst early on the morning of March 2nd to advocate for Joyce to remain at Helen Porter in the swing bed status until Ms. Sanchez could

return home from retrieving her son at college in North Carolina. Ms. Sanchez had previously informed Ms. Wurst that she, Ms. Sanchez, would be personally unavailable from March 2 through March 6, 2017. Helen Porter's decision to move Joyce to Mountain View in Rutland was made with the knowledge that Ms. Sanchez was personally unavailable to assist her mother on that date. Ms. Sanchez pleaded with Ms. Wurst by telephone to allow Joyce to remain at Helen Porter until the following week. Ms. Sanchez was told that due to a bed being offered, Helen Porter was required by Medicaid/Medicare to move Joyce if they found a bed.

25. Mountain View was over an hour away from Joyce's family, care team, supports, and familiar community. Upon arrival at Mountain View, Joyce was required to sign herself into the dementia unit, despite the fact that there were long-term care beds available at that facility. She remained in the dementia unit until Ms. Sanchez returned from transporting her son from college, and was able to facilitate Joyce's transition into Mountain View's long-term care unit on March 6, 2017. Rutland, like Burlington, is an hour from Joyce's home, family, support, and connections in the Middlebury area.

26. On March 7, 2017, Ms. Sanchez wrote a detailed letter to Dr. Fred Kniffin, President of the Helen Porter Board. The letter set forth all the reasons it was imperative that Joyce be placed in the Helen Porter long-term care unit as it was the most appropriate placement based on both her disabilities and recommendations from her care provider team. The letter further asserted that Joyce received differential treatment and was denied placement due to her mental illness. See Exhibit 1 attached hereto, a true and accurate copy of this letter.

27. On March 9, 2017, Barbara Hammerlind, APRN, the Psychiatric Nurse Practitioner from CSAC, wrote a letter to Dr. Fred Kniffin. Ms. Hammerlind's letter explained that Joyce had been a client of CSAC for twenty-four (24) years and that she would be better

served living closer to family supports, her counseling team, and familiar surroundings. See Exhibit 2 attached hereto, a true and accurate copy of this letter.

28. On March 17, 2017, Ms. Sanchez attended a meeting with Dr. Fred Kniffin, as well as several other members of the Porter Medical Center Board. As a result of that meeting, Acting Director Bruce Bodemer replaced Doreen Kadric as the primary liaison assigned to communicate with Ms. Sanchez about bed availability at Helen Porter

29. From March 17, 2017 through August of that year, Mr. Bodemer called Ms. Sanchez either weekly or bi-weekly to report that there were no available beds.

30. During August or September of 2017, a meeting was arranged so that Ms. Sanchez could meet the new Director of Helen Porter, Mary Jane Nottonson, who planned to take over the weekly communication formerly conducted by Mr. Bodemer. Ms. Nottonson's communication by email and phone was infrequent, so Ms. Sanchez began calling Helen Porter on a weekly basis for updates. It was determined that another meeting would be scheduled.

31. On October 24, 2017, Ms. Sanchez received an email from Mary Jane Nottonson, notifying her that Joyce would be evaluated by Helen Porter staff Michelle Wright, Director of Nursing, and Mary Alice Beazley, Nurse Manager Memory Care Unit, at Joyce's current place of residence, Mountain View. After the evaluation Ms. Sanchez spoke with Crystal Gibbs, the social worker at Mountain View who was present during the evaluation. Ms. Gibbs' notes suggested that Porter staff conducting the interview were less interested in Joyce's level of functionality than questioning Mountain View staff about Joyce's "behavioral status". Ms. Gibbs informed them that there were no behavioral notes in Joyce's chart because she did not 'act out.'

8

COMPLAINT FOR DAMAGES AND JURY TRIAL

32. On December 8, 2017, Ms. Sanchez had a meeting with members of the Helen Porter long term care unit. Present at the meeting were: Ms. Nottonson, Dr. Fromhold, who was Joyce's Attending Physician, Michelle, the Admissions Nurse (via telephone); and Dr. Kniffin.

33. During this meeting Ms. Sanchez strongly advocated on Joyce's behalf about why being placed at the Helen Porter long term care unit was the most appropriate and desirable placement. Ms. Sanchez told them that being in the Mountain View setting, so far from her familiar supports, was having an increasingly detrimental effect upon her mother's wellbeing and functioning. During the meeting, Dr. Fromhold was intent on discussing Joyce's mental illness, suggesting many times that Joyce's mental illness would be "too much" for the facility staff to deal with. Ms. Sanchez directly asked if Helen Porter long term care could meet her psychological and social needs to which Dr. Fromhold reluctantly replied, "Yes."

34. Despite the numerous requests for placement at Helen Porter long term care facility, Joyce was consistently denied entry and remained at Mountain View Facility, which, as noted, was over an hour away from her family, care team, and supports, solely because Helen Porter felt Joyce was "not a candidate for their facility" based on her "past behavior" and "acting out." These are simply vague code words for Joyce's psychiatric disability.

35. Based upon the foregoing facts, Helen Porter Nursing Home, Inc., d/b/a The University of Vermont Health Network - Helen Porter Rehabilitation and Nursing, discriminated against Joyce Elaine Munson on the basis of the fact that she was an individual with psychiatric disabilities in violation of the ADA, The Rehabilitation Act, the Federal Fair Housing Act, and Vermont's Fair Housing and Public Accommodations Act.

## FIRST CLAIM FOR RELIEF
## Violations of the Americans with Disabilities Act
## 42 U.S.C. §12101 *et. seq.*

36.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

37.     At all times mentioned in this complaint, the Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.* as amended, was in full force and effect and binding upon the Defendant. The ADA prohibits the Defendant from discriminating against anyone based on disability.

38.     The ADA applies to matters concerning the admission of persons with disabilities to long term care facilities, including nursing homes.  Nursing home decisions regarding admission, transfers, discharges, and the maintenance of special units for certain residents all are implicated by the ADA.

39.     The ADA protects qualified persons with disabilities from discrimination with regard to federally funded benefits, programs, and services. Title II of the ADA also extends the protections against discrimination set forth in section 504 of the Rehabilitation Act, as amended to all activities of State and local governments and other public entities. The ADA also requires nursing homes to provide services to people with disabilities in a non-discriminatory manner.

40.     Any form of discrimination on the basis of disability preventing individuals with disabilities from participating in or receiving the benefits of services, programs, or activities of a public entity, or preventing disabled individuals from the full and equal enjoyment of any public accommodation, is prohibited.

41.     The imposition or application of criteria "that screen out or tend to screen out" individuals or classes of individuals "from fully and equally enjoying any service, program, or

10

COMPLAINT FOR DAMAGES AND JURY TRIAL

activity [is prohibited,] unless such criteria can be shown to be necessary for the provision of the service, or program, or activity being offered." 28 C.F.R. §§ 35.130(b)(8). The prohibition includes the imposition of policies or criteria that, while not creating a direct bar to disabled individuals, indirectly prevents, or limits their ability to participate.

42. Helen Porter's refusal to admit Joyce Munson to the nursing home, and refusing to even place her on a waiting list for a bed at the nursing home, because, in their view, Joyce "would not be a good fit" with the facility, suggesting many times that Joyce's mental illness would be "too much" for the facility staff to deal with, despite their acknowledgement that the facility could meet Joyce's long term medical and mental health needs, is a prima facie violation of the ADA. Helen Porter's conduct prevented Joyce from participating in or receiving the benefits of the services and programs of the facility, which, by all accounts, was closest to her family and community supports which she had benefited from for her entire life. Helen Porter "screened out" Joyce from admission to the facility based solely on Joyce's mental illness.

43. As a direct, foreseeable, and proximate result of the conduct complained of in this cause of action, Joyce Munson suffered damage in amounts within the jurisdiction of the court, to be ascertained according to the proof.

44. As a further direct, foreseeable, and proximate result of Defendant's unlawful discrimination, Joyce Munson suffered mental and emotional distress in a sum within the jurisdiction of this court, to be ascertained upon the proof.

45. Plaintiff also prays for declaratory and injunctive relief, mandating that Defendant be ordered to certify that it conducts ongoing training regarding the ADA, and certifies that at all times its admission decisions are in all ways compliant with the ADA. Plaintiff also seeks

reasonable costs and attorney's fees against Defendant, as allowed by applicable statutes, for Plaintiff's prosecution of this matter.

## SECOND CLAIM FOR RELIEF
## Violation of The Federal Fair Housing Amendments Act
## 42 U.S.C. §§ 3601 *et. seq.*

46. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

47. At all times mentioned in this complaint, the Federal Fair Housing Amendments Act, 42 U.S.C. §3601, *et. seq.* was in full force and effect and binding upon the Defendant.

48. The original Fair Housing Act (FHA) was enacted as part of the Civil Rights Act of 1968, prohibiting discrimination in housing on the basis of race, color, religion, and national origin. Fair Housing Act, Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified at 42 U.S.C. §§ 3601-3619 (2000)). In 1988, the Fair Housing Act amendments added "handicap" as a further prohibited classification of discrimination. Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(a)-(b)(2), (e), 102 Stat. 1619, 1622 (1988) (codified as amended in scattered sections of 42 U.S.C.).

49. The FHA defines "handicap" broadly as "a physical or mental impairment which substantially limits one or more of such person's major life activities," including instances in which a person has "a record of having such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 3602(h) (2000) was in full force and effect and binding upon the Defendant. Title VII prohibits the Defendant from discriminating against anyone on the basis of handicap.

50. Joyce Munson was discriminated against by Defendant on the basis of a handicap, her psychiatric disability, in violation of the law. Helen Porter's refusal to admit Joyce Munson to the nursing home, and refusing to even place her on a waiting list for a bed at the nursing home because, in their view, Joyce "would not be a good fit" with the facility, suggesting many times that Joyce's mental illness would be "too much" for the facility staff to deal with, despite their acknowledgement that the facility could meet Joyce's long term medical and mental health needs, is a prima facie violation of the Federal Fair Housing Act as Amended. Helen Porter's conduct prevented Joyce from participating in or receiving the benefits of the services and programs of the facility, which, by all accounts, was closest to her family and community supports which she had benefited from for her entire life. Helen Porter "screened out" Joyce from admission to the facility based solely on Joyce's mental illness.

51. An additional basis for determining that Defendant violated the Federal Fair Housing Act is their inquiry into Joyce's mental health as a predicate to admission to the nursing home. The Fair Housing Act contains a "no-inquiry" regulation, which prohibits a housing provider from inquiring into a handicap of an applicant for tenancy. 24 C.F.R. § 100.202(c) (2006). With exceptions not applicable to this case, the regulations provide that "(c) It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person."

52. Helen Porter clearly violated this provision by repeatedly reviewing Joyce's medical and treatment records for information pertaining to her mental illness, and clearly premising their denial of admission to her upon her mental illness, although they attempted to

13

COMPLAINT FOR DAMAGES AND JURY TRIAL

cloak their denial by stating that their concerns were based on her "behavior." Moreover, as early as December 8, 2017, Dr. Fromhold conceded that the nursing home in fact was capable of meeting Joyce's psychological and social needs.

53. As a direct, foreseeable, and proximate result of the conduct complained of in this cause of action, Joyce Munson suffered damage in amounts within the jurisdiction of the court to be ascertained according to the proof.

54. As a further direct, foreseeable, and proximate result of Defendant's unlawful discrimination, Joyce Munson suffered mental and emotional distress in a sum within the jurisdiction of this court, to be ascertained upon the proof.

55. Plaintiff also prays for declaratory and injunctive relief, mandating that Defendant be ordered to certify that it conducts ongoing training regarding the Federal Fair Housing Act as Amended, and certifies that at all times its admission decisions are in all ways compliant with the Federal Fair Housing Act as Amended. Plaintiff also seeks reasonable costs and attorney's fees against Defendant, as allowed by applicable statutes, for Plaintiff's prosecution of this matter.

## THIRD CLAIM FOR RELIEF
### Violation of The Rehabilitation Act,
### 29 U.S.C. §701 *et. seq.*

56. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

57. Section 504 of the Rehabilitation Act of 1973, provides that "no otherwise qualified individual ... shall, solely by reason of her or his disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance. 29 U.S.C. §§ 701-797. Helen Porter Nursing Home receives federal funding to support the facility's operations.

58. At all times mentioned in this complaint, the Rehabilitation Act was in full force and effect and binding upon the Defendant.

59. For the same reasons that Helen Porter's conduct violated the ADA, Helen Porter's denial of admission to Joyce Munson based on Joyce's mental illness is a prima facie violation of the Rehabilitation Act.

60. As a direct, foreseeable, and proximate result of the conduct complained of in this cause of action, Joyce Munson suffered damage in amounts within the jurisdiction of the court to be ascertained according to the proof.

61. As a further direct, foreseeable, and proximate result of Defendant's unlawful discrimination, Joyce Munson suffered mental and emotional distress in a sum within the jurisdiction of this court, to be ascertained upon the proof.

62. Plaintiff also prays for declaratory and injunctive relief, mandating that Defendant be ordered to certify that it conducts ongoing training regarding the Rehabilitation Act, and certifies that at all times its admission decisions are in all ways compliant with the Act. Plaintiff also seeks reasonable costs and attorney's fees against Defendant, as allowed by applicable statutes, for Plaintiff's prosecution of this matter.

## FOURTH CLAIM FOR RELIEF
### Violation of Vermont's Fair Housing and Accommodations Act
### 9 V.S.A. §4501 *et. seq.*

63. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

64. At all times relevant in this complaint, the Vermont Fair Housing and Public Accommodations Act, 9 V.S.A. §4501 *et. seq.* was in full force and effect and was and is binding upon Defendant.

65. The law expressly states that "It shall be unlawful for any person: (1) To refuse to sell or rent, or refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling or other real estate to any person because of the . . . disability of a person . . .". The law also makes it unlawful "(2) To discriminate against, or to harass any person in the terms, conditions, privileges, and protections of the sale or rental of a dwelling or other real estate, or in the provision of services or facilities in connection therewith, because of the . . . disability of a person . . .".

66. Vermont's Fair Housing and Public Accommodations Act is "patterned on Title VIII of the Civil Rights Act of 1968 (Fair Housing Act), 42 U.S.C. §§ 3601–3631, *compare* 9 V.S.A. § 4503 (unfair housing practices) with 42 U.S.C. § 3603 (discrimination in sale or rental of housing), and therefore, in construing FHPA, we consider cases construing the federal statute." *Human Rights Com'n v Labrie, Inc.*, 164 Vt. 237, 243 (1995). Accordingly, conduct which violates Federal Fair Housing laws also violate Vermont's Fair Housing laws. The Vermont statute provides for civil as well as criminal enforcement.

67. For the identical reasons that Defendant's conduct violates the Federal Fair Housing Act as alleged above, this conduct also violates Vermont's Fair Housing and Public Accommodations Act.

68. As a direct, foreseeable, and proximate result of the conduct complained of in this cause of action, Joyce Munson suffered damage in amounts within the jurisdiction of the court to be ascertained according to the proof.

69.     As a further direct, foreseeable, and proximate result of Defendant's unlawful discrimination, Joyce Munson suffered mental and emotional distress in a sum within the jurisdiction of this court, to be ascertained upon the proof.

70.     Plaintiff also prays for declaratory and injunctive relief, mandating that Defendant be ordered to certify that it conducts ongoing training regarding Vermont's Fair Housing and Public Accommodations Act, and certifies that at all times its admission decisions are in all ways compliant with the Act. Plaintiff also seeks reasonable costs and attorney's fees against Defendant, as allowed by applicable statutes, for Plaintiff's prosecution of this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

1. For a declaration that Defendant's actions and practices as alleged herein were unlawful;

2. For compensatory damages for Joyce Munson's emotional pain and suffering in an amount to be proved at trial;

3. For exemplary damages due to Defendant's reckless disregard of Joyce Munson's rights accorded to her under the ADA, the Rehabilitation Act, and Federal and State Fair Housing laws;

4. For interest on damages, including pre- and post-judgment interest;

5. For an order enjoining Defendant from engaging in the unlawful acts complained of herein;

6. For reasonable attorneys' fees and costs, including expert fees, and other costs;

7. For penalties, special and general damages in an amount to be proven at trial;

8. For restitution and other equitable relief; and

9. Such other relief as the court deems just and proper.

DATED: September 29, 2020

TEPPER DARDECK & LEVINS, LLP

By: _____
James G. Levins, Esquire
Nancy S. Corsones, Esquire
Attorneys for Plaintiff,
73 Center Street
Rutland, VT  05701
jlevins@tdlfvt.com
ncorsones@tdlfvt.com
(802) 775-4361

18

COMPLAINT FOR DAMAGES AND JURY TRIAL