```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT

LISA L. SANCHEZ, as Administratrix :
of the ESTATE OF JOYCE ELAINE      :
MUNSON,                            :
                                   :
          Plaintiff,               :
                                   :
     v.                            :    Case No. 2:20-cv-153
                                   :
HELEN PORTER NURSING HOME, INC.    :
D/B/A THE UNIVERSITY OF VERMONT    :
HEALTH NETWORK-HELEN PORTER        :
REHABILITATION AND NURSING,        :
                                   :
          Defendant.               :
```

## OPINION AND ORDER

Plaintiff Lisa Sanchez, as administratrix of the estate of her mother, Joyce Munson, has sued Defendant Helen Porter Rehabilitation and Nursing ("Helen Porter") for discrimination on the basis of disability in violation of the Fair Housing Act, Americans with Disabilities Act, Rehabilitation Act, and Vermont Fair Housing and Public Accommodations Act. Sanchez argues that Ms. Munson was denied admission to Helen Porter because of mental illness.

Helen Porter now moves for summary judgment. It argues that Sanchez cannot make out a *prima facie* case of discrimination, and that even if she can, it had a legitimate and nondiscriminatory reason for denying admission to Ms. Munson –

namely, a lack of space. For the reasons set forth below, the motion for summary judgment is denied.

## Factual Background

Helen Porter Rehabilitation and Nursing, the Defendant, is a residential skilled nursing facility located in Middlebury, Vermont. ECF No. 35-1 at 1. The facility offers a variety of services including three that are particularly relevant to this case: post-acute care, memory care, and long-term care. *Id.*

Joyce Munson was born in Lincoln, Vermont in 1940 and lived in Addison County until 2016. ECF No. 35-1 at 2. Beginning in 2014, Ms. Munson suffered several falls that landed her in Helen Porter on three occasions prior to the filing of this lawsuit. *Id.* at 3. Ms. Munson passed away in Williston, Vermont on October 1, 2018. Her daughter, Lisa Sanchez, is the administratrix of her estate and the Plaintiff in this case.

Sanchez asserts that Ms. Munson struggled with mental illnesses including depression, borderline personality disorder, an anxiety disorder, and dementia. ECF 35-1 at 2. For the purposes of summary judgment, Helen Porter does not dispute Ms. Munson's mental illness. *See* ECF No. 32 at 8.

Ms. Munson resided at Living Well Care Home (Living Well) in Bristol, Vermont from October 2016 until February 2017. During her tenure at Living Well, Ms. Munson suffered "four or five" falls, the last of which resulted in her admission to the

2

Porter Hospital emergency department. ECF No. 35-1 at 4. Ms. Munson was a patient at Porter Hospital from February 9, 2017 until March 3, 2017. At some point during that tenure Ms. Munson told Porter Hospital staff that she did not feel safe returning to Living Well. ECF No. 35-1 at 4.

Shortly after Ms. Munson's admission to Porter Hospital, hospital staff referred her to Helen Porter — one of two methods through which Helen Porter receives requests for admission.[1] ECF No. 35-1 at 5; ECF No. 32-6 at 5. Around February 20, 2017, Sanchez spoke with Porter Hospital case management officer Anza Armstrong, the staff worker tasked with placing Ms. Munson into a long-term care facility upon her discharge from the hospital. ECF No. 32-7 at 23. Armstrong told Sanchez that, according to Helen Porter staff, Ms. Munson was "not a good fit" for residence at Helen Porter because of "past behavior" while at the facility. *Id.*

Armstrong told Sanchez that this decision was made by Helen Porter's Doctor Karen Fromhold, and that Ms. Munson would not be placed on a waitlist at Helen Porter. ECF No. 32-7 at 23. In her deposition, Armstrong was asked whether Helen Porter's rejection

---

[1] The other is through a direct patient application on a paper form. See ECF No. 35-1 at 5. In cases initiated via hospital referral, Porter Hospital staff generally include the patient's name and information regarding the patient's needs. Helen Porter will then gather additional information necessary to make an admission decision. ECF No. 35-1 at 5. The parties dispute whether hospital referral alone (without a written patient application) should have been enough to place a patient on a waitlist. ECF No. 35-1 at 10.

of Ms. Munson's application was due to a lack of beds. ECF No. 35-14 at 3. She responded, "[w]ell, it depends – I'm thinking about that – no." ECF No. 35-14 at 4. Armstrong was then asked if there was "anything about Joyce Munson's behaviors that was a concern on the part of the nursing home admitting her," to which she responded, "I don't remember it being behavior so much as her mental health needs." ECF No. 35-14 at 4.

Sanchez then set up a call with Doreen Kadric, Helen Porter's Admissions Director. Kadric stated that Ms. Munson's denial was based on a lack of space rather than on past behavior or mental health. ECF No. 32-7 at 25. Sanchez made a specific request for Ms. Munson to be placed on the waitlist, and Kadric acceded (although "begrudgingly" according to Sanchez). ECF No. 35-1 at 15; ECF No. 32-7 at 25. It is not clear whether Kadric agreed to add Ms. Munson to the waitlist for a memory care bed or a long-term bed. ECF No. 32-7 at 26. Sanchez assumed that it would be a long-term bed because Ms. Munson had not yet been diagnosed with dementia. *Id.* Kadric also represented to Sanchez that Ms. Munson was 34th on the waitlist at that time. *Id.* In her deposition, Kadric testified that Helen Porter did not have any long-term or memory care beds available when Ms. Munson was referred in February of 2017.

Still dissatisfied, Sanchez set up a meeting with various Helen Porter administrators including Acting Director Bruce

4

Bodemer. ECF No. 32-7 at 27. She claims that Bodemer informed her that "it didn't matter whether Joyce Munson was admitted to the Long Term Care [or] the Memory Unit . . . the important thing was to be admitted when the first bed became available." ECF No. 35-1 at 9; ECF No. 35-7 at 6; ECF No. 35-16 at 7. Sanchez attests that she was instructed to accept a spot on whichever waitlist was shortest – which, at that time, was the waitlist for memory care. ECF No. 35-1 at 9.

Sanchez contends that she was optimistic about her mother's case because preferred patients were frequently advanced to the top of the waitlist. She cites deposition testimony from Armstrong indicating that Helen Porter offered priority to Addison County patients. *See* ECF No. 35-1 at 8 ("Admissions did not always 'go right by the waiting list.'"); ECF No. 35-14 at 6 (same).

On March 3, 2017, Ms. Munson was discharged from Porter Hospital and moved to the Dementia Unit at Mountain View Center in Rutland, Vermont. ECF No. 35-1 at 13; ECF No. 32-7 at 10. The parties agree that Ms. Munson was not an appropriate patient for dementia care, so she was transferred to the "long-term care unit" at Mountain View. *Id.* at 14; ECF No. 32-7 at 10. She remained there while the parties continued to discuss her status on Helen Porter's waitlist.

5

On August 2, 2017, Kadric sent an email to Porter Hospital Case Manager Alison Wurst noting that Ms. Munson was 7th on Helen Porter's memory care waitlist and stating that it "will be a fun day when she hits #1." *See* ECF No. 35-10 at 1. *Id.* Counsel for Helen Porter contends that Kadric's "fun day" comment referenced no longer having to manage Bruce Bodemer's push to admit Ms. Munson. ECF No. 56 at 10. But Kadric's deposition testimony on that point is unclear:

> Q: "Was [the "fun day" comment] directed in any way toward Joyce Munson's daughter, Lisa Sanchez?
>
> A: No, it was Bruce making – having conversations that I was not a part of, that I couldn't control. Um, so, again, the facts are No. 7, if he was moving her up the wait list ahead of people, um, then that was – it was his behavior that was going to impact that, if she hit – if she moved to the top of the list.

On August 24, 2017, Mary Jane Nottonson took control of Helen Porter's waitlist from Kadric. The parties agree that until Nottonson began managing the waitlist, the list was simply a "folder of paper applications." See ECF No. 35-4 at 3. The folder "did not [include] a formal written application for Ms. Munson" despite Ms. Kadric's February representations that Ms. Munson had been added to a waitlist. ECF No. 35-1 at 18. Accordingly, when Nottonson took control of the waitlist and formalized it into an Excel spreadsheet in August of 2017, she assigned the current date, August 24, 2017, to Ms. Munson – a

6

date roughly six months after Ms. Munson's initial referral. ECF No. 32-6 at 14.

In early October of 2017, Helen Porter staff visited Ms. Munson at Mountain View to determine whether Helen Porter could meet her clinical needs. ECF No. 32-6 at 8. Following that investigation, Nottonson concluded that Ms. Munson was not an appropriate patient for Helen Porter's Memory Care Unit because she was "alert and oriented, and she was in a regular long-term care bed at Mountain View, not a memory unit bed." *Id.* As a result of this evaluation, Ms. Munson was moved laterally from Helen Porter's memory care unit waitlist to the long-term care waitlist, maintaining her post-dated application date of August 24. ECF No. 32-6 at 8. Sanchez testified that Helen Porter staff investigated Ms. Munson's "behavioral status," medical records, and prescription status, which she interprets as an evaluation of Ms. Munson's mental health. *See* ECF No. 35-16 at 4.

On December 8, 2017, Sanchez met with several Helen Porter administrators and was told that because Ms. Munson did not meet the requirements for placement in Helen Porter's memory unit, she could not be admitted. ECF No. 32-7 at 31. The parties agree that Sanchez *believed* that her mother could be admitted into one care category — memory care, e.g. — and later transferred to a more suitable environment but disagree over whether that was a "ruse" concocted by Sanchez to bypass legitimate admission

7

procedures or an acceptable entrance strategy counseled by Helen Porter administrators. *See* ECF No. 35-1 at 20.

As stated above, Ms. Munson passed away on October 1, 2018. ECF No. 32-7 at 17. Sanchez filed this complaint on September 9, 2020, alleging that Helen Porter discriminated against Ms. Munson on the basis of mental illness. *See* ECF No. 1-1 at 10-17. She seeks damages under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 501, and the Fair Housing Act (FHA), 42 U.S.C. §§ 3601-3619 *as amended* by the Fair Housing Amendments Act of 1988, Pub L. No. 100-430, §6(a)-(b)(2), (e), 102 Stat. 1619, 1622 (1988). She also claims that Helen Porter violated Vermont's Fair Housing and Public Accommodations Act (VFHPAA), 9 V.S.A. § 4500 *et seq. See* ECF No. 1-1 at 10-17.

Helen Porter moved for summary judgment under Fed. R. Civ. P. 56(a), arguing that Ms. Munson was denied admission to the facility due to a lack of appropriate bed space. That motion has been briefed by both parties and is now ripe.

## Discussion

I. **Summary Judgment Standard**

A court shall grant summary judgment if the moving party shows no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At summary judgment, the Court must "construe all

8

evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The movant bears the burden of demonstrating the absence of a genuine question of material fact. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). If the movant meets this burden, the opposing party must set out – by affidavits or otherwise as provided in Rule 56 – specific facts showing a genuine issue of material fact appropriate for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**II.   ADA, FHA, Rehabilitation Act, and VFHPAA Standard**

Sanchez has asserted discrimination claims under the ADA, FHA, Rehabilitation Act, and Vermont Fair Housing and Public Accommodations Act. *See* ECF No. 1 at 10-17. Each of these statutes proscribes disability discrimination. *See Skorupska v. 525 West 52 Property Owner LLC*, 625 F. Supp. 3d 90, 108 (S.D.N.Y. 2022) (discussing the same three federal statutes). Each also adopts the three-part burden shifting test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See*

9

*Skorupska*, 625 F. Supp. 3d at 108; *see also Spinette v. Univ. of Vermont*, 292 A.3d 1225 (Vt. 2023) (applying the *McDonnell Douglas* framework to the Vermont Public Accommodations Act). Under each statute, "a plaintiff [must] show that [she] was qualified for an available benefit and was denied that benefit." *Johnson v. Levy*, 812 F. Supp. 2d 167, 180 (E.D.N.Y. 2011).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff alleging discrimination must first make out a *prima facie* case of discrimination. *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). If the plaintiff meets this burden, the defendant must then "articulate — but not prove — a legitimate, nondiscriminatory reason for the [adverse action]." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988). The burden then shifts back to the plaintiff to prove that the defendant's articulated reason for its conduct was "not its true reason[], but [ ] a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Summary judgment is appropriate if "no reasonable jury could find that the defendant's actions were motivated by discrimination." *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000).

### III. Sanchez's *Prima Facie* Case

The first question is whether Sanchez has made out a *prima facie* case of discrimination on the basis of disability. The burden to establish a *prima facie* case is "not onerous."

10

*Burdine*, 450 U.S. at 253. Sanchez satisfies this burden if she "introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008). To make out a *prima facie* of disability discrimination in housing,[2] Sanchez must show "(1) that a person residing in or intending to reside in the dwelling after its sale or rental to the plaintiff had a handicap as defined in the [relevant statute], (2) that the plaintiff sought and was qualified to purchase or rent the housing, (3) that [the plaintiff] was rejected, and (4) that the rejection occurred in circumstances giving rise to an inference of discrimination on the basis of the handicap."[3] *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014); *Skorupska*, 625 F. Supp. 3d at 110.

---

[2] The standard could alternatively be stated in terms of treatment. Counts I and III of the Complaint allege that Helen Porter's actions precluded Ms. Munson from enjoying "the benefits of the services and programs of the facility" and from receiving "the benefits of . . . any program or activity receiving Federal financial assistance." ECF No. 1 at 10, 14-15. In cases involving exclusion from treatment programs, the legal standard is stated as "(1) [plaintiff] is a 'handicapped person' as defined by the [relevant statute]; (2) is 'otherwise qualified' to participate in the offered activity or benefit; (3) was excluded from such participation solely by reason of her handicap; and (4) was denied participation on a program that receives federal funds." *Biondo v. Kaledia Health*, 935 F.3d 68, 73 (2d Cir. 2019). This standard almost exactly mirrors the standard for housing discrimination. Accordingly, while the Court will apply the standard for housing discrimination, the result would be the same under either framework.
[3] Helen Porter states the fourth prong of the prima facie case as "defendant's services remained available to others." ECF No. 32 at 8 (citing *Mitchell v. Shane*, 350 F.3d 39 (2d Cir. 2003)). The Second Circuit "not always been perfectly consistent in describing the elements of a *prima facie* case" and has employed both formulations. *Skorupska*, 625 F. Supp. 3d at 110 n. 19. The Court adheres to the "inference of discrimination" articulation from *Olsen* because it was set forth more recently, because *Olsen* deals with disability discrimination, and because "the point of the fourth prong under either

For the purposes of summary judgment, Helen Porter concedes the first three elements of Sanchez's *prima facie* case. ECF No. 32 at 8. It provisionally agrees (1) that Ms. Munson was disabled and therefore protected under the various anti-discrimination statutes; (2) that she sought Helen Porter's nursing home services; and (3) that she was rejected. ECF No. 32 at 8. However, Helen Porter disputes the fourth prong of Sanchez's prima facie case and argues Ms. Munson was rejected because no beds were available "during the time that she sought admission." *Id.*

The Second Circuit has counseled that a plaintiff may prove discrimination by outlining "a 'mosaic' of intentional discrimination by identifying 'bits and pieces' of evidence that together give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist*, 801 F.3d 72, 87 (2d Cir. 2015). While Sanchez does not have a "smoking gun," the facts of this case, taken in the light most favorable to Sanchez, create a mosaic that raises "a reasonable inference that the action taken by [Helen Porter] was based on an impermissible factor." *Holcomb*, 521 F.3d at 138.

---

version of the test is the same." *Babul v. Demty Associates Limited P'ship*, 17-cv-5993, 2019 WL 79423 at *5 (E.D.N.Y. Jan. 2, 2019). Ultimately, the goal is to determine whether there is "some evidence to suggest" that a plaintiff was discriminated against based on a disability. *Id.*

There are several pieces of evidence that contribute to this inference. First, and most importantly, Armstrong testified that Helen Porter's initial denial of Ms. Munson's referral was based on "mental health." Helen Porter does not address Ms. Armstrong's deposition testimony in its reply brief, *see* ECF No. 56, but has argued that another section of Armstrong's testimony is unpersuasive because Armstrong worked for the hospital and lacked firsthand knowledge of Helen Porter's practices. It is well settled that assessments of credibility "are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (quotation omitted). It was Armstrong's job to communicate with Helen Porter about patient placement. A reasonable jury could find that Armstrong was either familiar with Helen Porter's general practices or had conversations with Helen Porter staff about Ms. Munson, supporting her testimony that Ms. Munson was denied admission on the basis of mental health.

Doreen Kadric's August 2, 2017 email that it "will be a fun day when" Ms. Munson leaves Helen Porter's waitlist adds to the inference of discrimination. *See* ECF No. 35-10 at 1. Interpreted in the light most favorable to Sanchez, it indicates that Kadric (Helen Porter's then-Admissions Director) had some level of bias against Ms. Munson. The source of this bias is unclear, but the email suggests that Kadric believed that admitting Ms. Munson

13

would come with difficulties beyond ordinary caregiving. Although Helen Porter submits that Kadric's comment referenced her working relationship with Bodemer, Kadric's deposition response does not articulate a desire to cease dealing with Bodemer. Instead, it provides support for Sanchez's contention that Bodemer advocated for Ms. Munson's admission but that he was stymied by opaque (and possibly discriminatory) procedures.

Ms. Munson's later evaluation at Mountain View also plausibly supports an inference of discrimination. Sanchez's testimony that Helen Porter staff investigated Ms. Munson's "behavioral status," medical records, and prescriptions status – taken in the light most favorable to Sanchez – supports the premise that Helen Porter's investigation was into Ms. Munson's mental illness. *Id.* at 5. While Helen Porter's briefing contends that this was part of a routine patient evaluation for admission to memory care, *id.*, neither party has submitted evidence on that question.

Finally, the opacity of Helen Porter's waitlist contributes to Sanchez's *prima facie* case. Helen Porter's waitlist was simply a "folder of papers" from Ms. Munson's initial referral in February until Nottonson took control in August. *See* ECF No. 35-1 at 10, 18. And while Sanchez was told that Ms. Munson would be added to the waitlist in February, her application was missing when Nottonson took over in August. The question of why

14

Ms. Munson's application was missing — despite representation that she had been added to the waitlist – is a genuine and unresolved issue of material fact best addressed by a jury.

Two other aspects of Helen Porter's waitlist management contribute to Sanchez's *prima facie* case. First, Sanchez alleges that Helen Porter offered priority admission to residents of Addison County but did not follow that practice for Ms. Munson. *See* ECF No. 35-14 at 6. Second, Sanchez states that she was told by Bodemer that her mother could be transferred into a different care group once admitted to the nursing home, making initial admission (and therefore selecting the shortest waitlist) more important than the precise care category. See ECF No. 35-1 at 16. Ms. Munson was subsequently removed from the memory care waitlist due to a finding of non-suitability (despite rising from 34th to at least 7th), making her admission to memory care, and possible transfer into long-term, impossible.

For the purposes of summary judgment, the Court finds genuine issues of material fact in dispute that, taken in the light most favorable to Sanchez as the non-moving party, raise a reasonable inference of discrimination.[4]

---

[4] Sanchez presents additional facts that contribute to an inference of discrimination. She claims that she was told by the discharge planner at Porter Hospital that Ms. Munson was "not a good fit" for Helen Porter and that Ms. Munson did not fit Helen Porter's "patient profile." ECF No. 35 at 4. She also claims that Kadric wrote an email stating that she would give "the party line" that Helen Porter did not have beds available when denying Ms. Munson's request for entry. Id. Finally, Sanchez states in an interrogatory response that Ms. Munson's admission was denied based on an

15

## IV.   Helen Porter's Legitimate, Nondiscriminatory Explanation

Because Sanchez has set forth a *prima facie* claim of discrimination based on her mother's disabilities, the burden of production shifts "to the defendants to come forward with a legitimate, nondiscriminatory reason for their decision." *Skorupska*, 625 F. Supp. 3d at 114; *Olsen*, 759 F.3d at 152. The Supreme Court has explained that "this burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (2000)). The Second Circuit has expounded that the defendant's burden of production at this stage is "minimal." *See Mhany Mgmt. Inc. v. County of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016).

Helen Porter has provided testimony indicating that it did not have space available in any of its care units - but most importantly in its long-term care unit - when Ms. Munson sought admission. *See* ECF No. 32-1 at 4. Ms. Munson was initially placed on a waiting list in February of 2017. *See* ECF No. 32-1 at 6. When management of the waitlist transferred to another employee, in August of 2017, Ms. Munson's application could not

---

outstanding invoice - part of a broader pattern of shifting and pretextual excuses. ECF No. 35-7 at 4. Helen Porter presents hearsay objections to these points under Fed. R. Civ. P. 56(c)(2) that the Court need not address at this phase because other evidence in the record is adequate to support Sanchez's prima facie case.

16

be found. Her application was therefore dated to the date of the waiting list's reorganization. ECF No. 32-1 at 7-8. As a result of this date change, and a medical determination that Ms. Munson was not suitable for Helen Porter's memory care unit, Ms. Munson was denied entry to Helen Porter.

This evidence of a neutral, non-discriminatory procedure is sufficient to satisfy Helen Porter's "minimal" burden.

## V.  Sanchez's Proof of Pretext

Once the defendant satisfies its burden of production on the presence of a legitimate, non-discriminatory explanation for its action, the plaintiff bears the "burden of proof" in showing that "the adverse action was motivated, at least in part, by an impermissible reason." *Mhany*, 819 F.3d at 613. "To survive summary judgment on the question of pretext, [a plaintiff] must produce evidence from which a reasonable juror could conclude that [the defendant's] real motivation" for the adverse action was discrimination. *Gran v. TD Bank, NA*, 204 F. Supp. 3d 446, 453 (D. Conn. 2016) (citing *Hicks*, 509 U.S. at 516-17). A plaintiff can do this by relying on the *prima facie* case and producing evidence showing that the defendant's explanation is unworthy of credence. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 122, 143 (2000)).

The Second Circuit has also noted that "departures from procedural regularity" can allow juries to infer pretext for

17

discrimination. *Stern v. Trs. Of Columbia Univ.*, 131 F.3d 305, 310 (2d Cir. 1997)); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) ("]D]epartures from procedural regularity can raise a question as to the good faith of the process where the departure may reasonably affect the decision."). Those procedural irregularities must "themselves contribute to the implication of discrimination in order for the plaintiff to survive summary judgment." *Bunting v. Kellogg's Corp.*, 14-cv-621, 2016 WL 5799291 at *6 (D. Conn. Sept. 30, 2016) (citing *Stern*, 131 F.3d at 313). In other words, procedural irregularity alone is not enough to support an inference of discrimination – it must contribute to other evidence "already pointing in the direction of discrimination." *Riccobono v.* Crew, 00-cv-5386, 2010 WL 11602749 at *10 (E.D.N.Y. 2010); *Almodovar v. Cross Fin. Corp.*, 20-cv-1179, 2022 WL 1810132 at *7 (D. Conn. June 2, 2022).

As noted above, Sanchez has pointed to specific facts supporting a reasonable inference that Helen Porter discriminated against Ms. Munson on the basis of disability. She has testimony from a hospital worker indicating that Ms. Munson's initial denial was based on her "mental health needs," ECF No. 35-14 at 4, and an email from the Admissions Director suggesting some amount of bias against Ms. Munson for an unspecified reason. *See* ECF No. 35-10 at 1. Finally, she notes

18

that Helen Porter's October 2017 evaluation of Ms. Munson involved an investigation of her "behavioral status" and prescriptions status, which may indicate evaluation of her mental health.

This is sufficient evidence to allow a reasonable jury to infer discrimination from Helen Porter's departure from its regular procedures. Helen Porter acknowledges that there was no structured waitlist prior to August of 2017, and that while Kadric kept paper records of applications, Ms. Munson's was missing when Nottonson took control of the admissions process. This was despite Kadric's promise to place Ms. Munson on the waitlist in February of 2017. Because Ms. Munson's application was missing, Nottonson dated Ms. Munson's file to the date on which she assumed control, placing Ms. Munson in a worse position than she would have been otherwise.

Other open questions regarding waitlist administration could contribute to a reasonable jury finding pretext. For example, if Helen Porter offered preferential admission to some patients from Addison County but did not do so for Ms. Munson, a reasonable jury could find that to be evidence of discrimination. Also, if Helen Porter allowed some patients to enter into one care group and transfer to another but denied this opportunity to Ms. Munson, a reasonable jury might find

19

Helen Porter's reliance on the waitlist to be pretext for discrimination.

Considered altogether, these facts could lead a reasonable trier of fact to conclude that Helen Porter administrators did not want to admit Ms. Munson because of her disability and manipulated her spot on the waitlist as a result. Accordingly, Defendant Helen Porter's motion for summary judgment is **denied.**

This case is scheduled for a pretrial conference on Monday, October 30, 2023 at 11:30 a.m.

SO ORDERED.

DATED at Burlington, in the District of Vermont, this 5th day of October, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge